**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------X
ALMA ROPER and EDDIE RODRIGUEZ,　　　Index No.:

　　　　　　　　　　　　*Plaintiffs*,　　　　　　　　**COMPLAINT**　1:25-cv-01396

　　　　　　　　　　　　　　　　　　　　　　　**JURY TRIAL DEMAND**

　　　　- against -

AMERICAN FEDERATION OF STATE,
COUNTY, AND MUNICIPAL EMPLOYEES,

　　　　　　　　　　　　*Defendant*.
-----------------------------------------------------------X

　　　　Plaintiffs ALMA ROPER ("Ms. Roper") and EDDIE RODRIGUEZ ("Mr. Rodriguez") (collectively, "Plaintiffs"), by and through their attorneys, Ballon Stoll P.C., complaining, the following against Defendant, AMERICAN FEDERATION OF STATE, COUNTY, AND MUNICIPAL EMPLOYEES ("AFSCME" or "Defendant"):

**JURISDICTION AND VENUE**

　　　　1.　　　　This Court has subject matter jurisdiction of this matter pursuant to 29 U.S.C. §412 and 29 U.S.C. §185.

　　　　2.　　　　As the Southern District is the district where a substantial part of the events giving rise to the claims occurred, venue is proper within this district pursuant to 28 U.S.C. § 1391(b)(2).

**THE PARTIES**

　　　　3.　　　　Plaintiff Alma Roper is the former Executive Vice President of Local 1549 (the "Local").

　　　　4.　　　　For thirty-three (33) years Ms. Roper held numerous positions before becoming the Local 1549 Executive Vice President in 2009: Pct/Spct Chapter Secretary-Treasurer, Pct/Spct Chapter Chair, Pct/Spct Chapter Delegate, Local 1549 Delegate, Co-Chair local 1549 Political

Action Committee, Lobbyist, Grievance Representative, Chair's the Board of Delegates, DC37 Vice President (10) years, DC37 Delegate, Chair DC37 Scholarship Committee, and DC37 Representative to the White House.

5.      Plaintiff Eddie Rodriguez is the former President of Local 1549.

6.      For forty-five (45) years Mr. Rodriguez held numerous union positions before becoming President of Local 1549: DC37 Vice President, DC 37 President for ten (10) years, AFSCME International Vice President for thirteen (13) years, Local 1549 Fifth Vice President, Delegate for Local 1549, Delegate for DC37, Chapter Chair, and Shop Steward.

7.      Defendant AFSCME is a national labor organization consisting of, largely but not exclusively, public employees. Defendant AFSCME is organized into Districts including District Council ("DC") 37 and Local Unions including Local 1549. Local 1549 is a part of District Council 37.

8.      Defendant AFSCME placed Local 1549 into Administratorship and is effectively the successor to Local 1549 and was operating and managing Local 1549 by its Trustee when the relevant events occurred.

**JURY DEMAND**

9.      Plaintiffs hereby demand a trial by jury in this action.

**STATEMENT OF FACTS**

10.     In 2009, Ms. Roper was elected Executive Vice President, a position she retained throughout the remainder of her time at the Local.

11.     Ms. Roper served as Vice President of the AFSCME District Counsel 37 for ten (10) years.

12.     Mr. Rodriguez became a member of AFSCME approximately fifty (50) years ago.

13.     Mr. Rodriguez served as the President of the Local for twenty-one (21) years.

14.     Plaintiffs held their positions until September 19, 2022.

15.     On September 19, 2022, AFSCME President Lee Saunders informed Plaintiffs that Local 1549 was being put into an Administratorship. The Administratorship Notice is annexed hereto as **Exhibit A.**

16.     On September 19, 2022, Plaintiffs were suspended and later that same day terminated. The September 19, 2022 letter from Administrator James Howell to Ms. Roper (the "Termination Letter"), is annexed hereto as **Exhibit B**.

17.     The decision to place Local 1549 under an Administratorship and to terminate Plaintiffs purportedly stemmed from a May 2022 audit conducted by AFSCME International Uniton Field Auditors William Delpino and Paul Apata.

18.     During the audit, Mr. Delpino and Mr. Apata reviewed various financial records and documents maintained by the Local. *See* the Judicial Panel Hearing Transcript dated October 4, 2022, annexed hereto as **Exhibit D**, at 34:3-19; 36:2-14.

19.     Plaintiffs were available to speak with them to clarify any questions the auditors may have had, though the auditors did not seek either Plaintiff Roper or Plaintiff Rodriguez out for these or any other purposes. Ex. D at 87:11-19; 123:11-128:9; 170:11-171:10; *see* Affidavit of Alma Roper dated August 9, 2023, annexed hereto as **Exhibit E**, at ¶ 20; *see* Affidavit of Eddie Rodriguez dated August 9, 2023, annexed hereto as **Exhibit F**, at ¶ 20.

20.     The investigative portion of the audit lasted for approximately two weeks. **Ex. D** at 34:20-22.

21.     At the end of this process, Mr. Delpino drafted an audit report (the "Audit Report Draft") dated September 1, 2022, annexed hereto as **Exhibit C**.

22.    Per the custom, standard, and practice of AFSCME, the Local had thirty (30) days to provide comments before a final draft was issued. **Ex. D** at 37:14-21; 76:12-20.

23.    Upon receipt of the Audit Report Draft, Plaintiffs' Political Action Assistant, Wanda Williams, began preparing a rough draft of several policy changes (the "Policy Changes Draft"), annexed hereto as **Exhibit G**. Ex. D at 105:6-14.

24.    Plaintiffs notified the auditors of forthcoming comments, which would be delivered within thirty days after their receipt of the Audit Report Draft. **Ex. D** at 111:3-112:2.

**The Audit**

25.    The concerns identified by the auditors include the following: (a) approval of officer and staff salaries; (b) retirement payments for Second Vice President Ralph Palladino; (c) the Local's American Express Credit Card; (d) gift cards purchased and distributed; (e) car service expenditures; (f) operating deficits for 2021 and 2022; (g) CPA annual audits; (h) payments to consultants and attorneys; (i) lost time payments; (j) bank accounts and reconciliations; (k) the filing system for paid bills; (l) meeting minutes; and (m) policies and procedures manual. Ex. C at p. 1.

26.    None of these concerns have or had any merit, which would have become clear upon a full investigation. Plaintiffs felt compelled to exercise the right to comment, to which they were entitled, to provide clarity and show that these concerns were unfounded.

Approval of Officer and Staff Salaries

27.    The Audit Report Draft claimed that there was no documentation in meeting minutes or as part of the annual budget for approval of staff salaries or employee wage increases. Ex. C at p. 1. It recommended that the Local's Executive Board be provided with documentation detailing salaries and projected increases, to be maintained as part of the supporting documents for

approval of the annual budget. It recommended that the Executive Board minutes should clearly document the annual approval of salaries, benefits, and annual wage increases. **Ex. C** at pp. 1-2.

28.    Had Plaintiffs been given an opportunity to respond, they also would have explained that they did not themselves set or approve salaries. **Ex. D** at 113:12-118:9. All officers' salaries were voted on by the Executive Board and/or the Board of Delegates (including the President Assistants and any consultants). The Comparable Pay Committee was set up including the Business Manager to propose what those officer's salaries should be. Furthermore, the only increase made to any officer's salaries was done through a collective bargaining agreement. **Ex. F** at ¶¶ 28-30.

29.    Notwithstanding, the Local's Policy Changes Draft proposed that as part of the annual budget adoption, a schedule of executive staff and employees' salaries, benefits, and annual wage increases would be included and that this document adoption would be part of the approval of the budget by the Executive Board of the Local. **Ex. G** at p. 1**; Ex. E** at ¶ 31; **Ex. F** at ¶ 22

<u>Retirement Payments for Second Vice President Ralph Palladino</u>

30.    The Audit Report Draft raised concerns about certain payouts to former Second Vice President Ralph Palladino and the Local's rescinding of a policy capping compensatory payments at a hundred and thirty (130) hours and/or twenty (20) days. **Ex. C** at p. 2.

31.    The Audit Report Draft recommended that legal counsel be consulted as to whether individuals receiving compensatory time payouts, if any are planned or have been made, are eligible to receive those payments, or whether overtime should have been paid. It recommended a policy of detailing and documenting the circumstances under which compensatory time is to be paid or taken and noted that the Local's current policy of claiming compensatory time and cashing it out appears, on its face, inappropriate. It also expressed concerns that the auditors did not observe

evidence that the Local had a time clock for officers to punch in and out of work. It further claimed that it could not verify that the Local approved the cash outs for Palladino. It recommended that the Local reconsider continuing large separation payments upon retirement of its officers, develop a clearly defined policy for employee and officer retirement payments, and document the discussion and approval of large amounts of separation/retirement payments made to key officers and employees. Ex. C at p. 2-3.

32.      This concern was misguided. Second Vice President Palladino retired in December 2021, after 42 years of service. See Affidavit of Ralph Palladino dated August 10, 2023, annexed hereto as **Exhibit H**, at ¶ 1, 3. The retirement compensation package for Mr. Palladino was to cover retirement funds, vacation, severance pay, and paid annual time to which he was properly entitled under a policy modeled after DC 37's policy. The policy had been in place at the Local for years without issue in past audits. **Ex. D** at 189:5-16; **Ex. E** at ¶ 20; Ex. F at ¶ 11. Plaintiffs did not have oversight responsibilities regarding the ultimate decision to make retirement payments or any other payments to Mr. Palladino. Ex. D at 189:5-16. The payment of Compensatory Time was a long-standing practice of the locals since before the last Administratorship and was always paid out to those who left service. This practice had never been challenged by any AFSCME audit including the one in performed in 2019. If there was a problem with this practice it should have been challenged in 2019. In addition, nowhere in AFSCME's Fiscal Policy document is the use of Compensatory Time mentioned and no guidelines exists. No guidance by AFSCME was ever provided to the Local on this issue. The policy of the Local towards Mr. Palladino was the same used for all severanced personnel. **Ex. F** at ¶ 24.

33.      Nevertheless, the Policy Changes Draft suggested sending a letter to Mr. Palladino on behalf of the Local requesting the return of $29,980.55 (forty-three [43] days of compensatory

time payment) or, in the alternative, that two (2) officers of the Local go to meet with him to request the same and clarify the circumstances surrounding the payout. **Ex. G** at p. 3.

34.     To the remaining points, the Policy Changes Draft responded by recommending that compensatory time be capped at a hundred and thirty (130) hours or twenty (20) days. It clarified that compensatory time is time off for working over normal work week hours. It also clarified that there is to be under no circumstances a payout by the Local for compensatory time, and that compensatory time would be accrued and noted, and individuals would have to use their compensatory time within thirty (30) days of accrual. All other accumulated compensatory time on the books would have to be used in the following year as a spend down to eliminate the time on the books. Thereafter, all accumulated compensatory time must be used within a thirty (30)-day period and no compensatory time would be carried over from year to year. **Ex. G** at pp. 2-3; **Ex. E** at ¶ 32; **Ex. F** at ¶ 23.

35.     The Policy Changes Draft further addressed vacation time, noting that, without exception, the accrual of vacation time for all Officers and Staff would be restricted to thirty (30) days for cash payments. The accrual of more than thirty (30) days of vacation time in a calendar year would need to be approved by a supervisor. Carrying an excess of thirty (30) days to the next calendar year would need to be approved, and a carryover form would need to be completed memorializing such with two officers' signatures. The Policy Changes Draft further stated that all vacation time. exceeding thirty (30) days would have to be used, donated, or left to the Local as a contribution if not used in the calendar year. **Ex. G** at p. 2; **Ex. E** at ¶ 33; **Ex. F** at ¶ 24.

<u>American Express Credit Card</u>

36.     The Audit Report Draft expressed concerns surrounding the use of the American Express credit card assigned to Secretary-Treasurer Felix Cooper. It noted that the card was mainly

used for purchasing flight tickets and booking accommodations during conventions and out of state meetings. It claimed the Local had provided no written credit card policy. It outlined the process used by the Local: the Local's Secretary-Treasurer prepared a general expense voucher for the total charges incurred on each credit card statement, which required the signature authorization of the President, Secretary-Treasurer, and the Business Manager. The auditors claimed there were instances where the three (3) signatories were not present on the expense voucher. They also claimed that expense reports were not prepared for individual airfare and hotel charges, the union business purpose of the charges was not explained on expense reports, and attendees were not listed. **Ex. C** at pp. 3-4; **Ex. D** at 47:22-52:11.

37.    The auditors recommended reducing or eliminating use of the credit card and implementing a reimbursement policy in its place. The auditors also provided recommendations should the Local choose to continue using its credit card, including the creation of a written policy identifying who may use the card and what it may be used for, requiring timely accounting of all charges, attaching supporting documentation to the credit card slip with an explanation of the union business purpose, attaching itemized itineraries for airfare and lodging, and reconciling the charges to expense reports in a timely manner. **Ex. C** at p. 4.

38.    While the credit card was placed in Secretary-Treasurer Cooper's name, he never actually had physical possession of it. *See* Affidavit of Felix Cooper dated August 12, 2023, annexed hereto as **Exhibit I**, at ¶ 5. The credit card was held by the Local's Business Manager, and was used mainly for payment of conference fees, lodging, and airfare. **Ex. D** at 191:7-19; **Ex. I** at ¶ 5. As mentioned above, the Local's Business manager handled the local's finances for over twenty (20) years and despite audits every year by an independent auditor and every two (2) years by AFSCME, not one time was any discrepancies found with the use of the American Express

Credit Card during this time. **Ex. E** at ¶ 16. The Secretary Treasurer's review and signature were required for all uses of the credit card and Secretary-Treasurer Cooper fulfilled his obligation to do so. **Ex. D** at 190:6-22; **Ex. E** at ¶ 19; **Ex. F** at ¶ 10. Member balances were reviewed at the duration of all hotel stays to ensure a zero balance and any balance in excess of zero would be paid by the responsible member. **Ex. I** at ¶ 5.

39.    In addition, the Local clarified in their Policy Changes Draft that the use of the union credit card would be strictly limited to a specific amount. All expenses and charges made to the credit card would need to be reconciled within thirty (30) days of when the charges were made. A copy and review of all the charges made on the credit card would be given to all the officers for inspection and signature. Each officer would sign a statement attached to the report indicating they had reviewed, approved, and verified that the expenses were union-related. **Ex. G** at p. 4; **Ex. E** at ¶ 34; **Ex. F** at ¶ 25. Additionally, no officer or member of the Local would have use of the credit card. **Ex. E** at ¶ 19; **Ex. F** at ¶ 10.

<u>Gift Cards Purchased and Distributed</u>

40.    The Audit Report Draft claimed that the Local had no written policy regarding gift cards, though the total expenditure for them was approved annually by the Local's Executive Board. It raised concerns that the individuals who received gift cards did not sign for them. The auditors claimed they were unable to determine how many gift cards were in the Secretary-Treasurer's possession, or how many he had distributed. They claimed that the Local did not maintain a complete reconciliation of gift cards purchased to gift cards distributed, so they were unable to determine whether the gift cards were distributed to unauthorized persons. The Audit Report Draft recommended minimizing the purchase and distribution of gift cards, approving a detailed policy that clearly indicates who qualifies to receive a card and under what circumstances

one might be distributed, better tracking this purchase and distribution with signature sheets, and performing periodic reconciliations to verify that the physical number of cards agrees to the number purchased, less the number distributed. **Ex. C** at p. 5; **Ex. D** at 52:12-56:14.

41.    This Audit overlooked that the Local was already in the process of minimizing gift cards at the time of the 2022 audit; the purchases were minimized by $10,000.00 in 2021 and a plan was in place to minimize them by an additional $25,000.00 in 2022, but the Administratorship interrupted that plan. **Ex. I** at ¶ 6.

42.    Moreover, the Policy Changes Draft clarified that there would be no stockpiling of gift cards and that, after Board approval of the gift cards, cards would be distributed to eligible designated recipients. It stated that a list and signature list would be maintained by the Business Manager and one other person. Designated recipients would have ninety (90) days to collect their gift cards. If, after that time, the cards purchased had not been distributed and signed for, they would be cashed out and the funds returned to the union treasury. A detailed report would be maintained and available for review, approval, and verification by all Officers. All members and staff getting gift cards would need to sign for the cards upon receipt. The final report would be filed with the Treasurer, Business Manager and a third local designee. An "independent" reconciliation review of the distribution would be conducted by the Executive Vice President and/or her designee. That reconciliation report would be filed with the Business Manager and the CPA, and reported in the monthly Financial Report in which such review took place and would be a part of the Executive Board and Delegates report and Annual Budget. **Ex. G** at p. 4; **Ex. E** at ¶ 35; **Ex. F** at ¶ 26.

<u>Car Service Expenditures</u>

43.     The Audit Report Draft raised concerns regarding the Local's use of car services. More specifically, it highlighted Plaintiff Rodriguez's use of the car services and speculated that his use may not have been reported as taxable income. The Audit Report Draft recommended that the Local curtail the use of the car service in favor of less expensive means of transportation whenever possible and develop a written policy detailing what positions and what instances require the essential use of a car service, to be approved by the executive board and/or the general membership and noted in the meeting minutes. **Ex. C** at p. 6.

44.     The use of car services was heavily affected by the COVID-19 pandemic and resulting shutdown. Plaintiff Rodriguez lives in Rockland County, did not drive, and had no available public transportation to use to attend to his duties in New York City. **Ex. F** at ¶ 8. He used the car services to visit essential workers at various worksites in New York City throughout the shutdown to distribute masks and other PPE. He took members' complaints and addressed them, at times with DC 37 Executive Director Henry Garrido, to city agency heads and the city Office of Labor Relations. **Ex. F** at ¶ 9. Plaintiff Rodriguez did not use the Local's car service for personal use at any time. **Ex. F** at ¶ 8.

45.     Additionally, the Policy Changes Draft would have responded to the Audit Report Draft by clarifying that personal use of the car service would be strictly prohibited. If the car service would be found or determined to be utilized for personal use, the expense of the use would be incurred by the user. All use of the car service would need to be pre-approved by two (2) non-using officers. The use of the car service would be strictly limited to use for emergencies and unforeseen occurrences that warrant its use. All accumulated wait times exceeding fifteen (15) minutes would be incurred by the user, without exception. The only time the car service could be

used would be after 8:30 p.m. for members and staff who have conducted union business. **Ex. G** at p. 5; **Ex. E** at ¶ 36; **Ex. F** at ¶ 30. It also noted that the Local would explore removing all officers from use of car service and implementing a monthly car allowance stipend instead, in the 2023 fiscal year. It noted that currently, no officer receives any compensation for the use of their personal vehicle for union business.

Operating Deficits for 2021 and 2022

46.    The Audit Report Draft raised concerns regarding operation deficits for 2021 – an operating deficit of $24,978.67 – and the period from January to April 2022 – $339,289.02. It took issue with the fact that the majority of the costs were personnel costs. **Ex. C** at p. 6. It complained that the 2022 annual operating budget submitted to the International Union for the Local projected an operating excess for the year of $1,279.00 on annual net revenues (after payment of per capita taxes and fees) of $4,089,212. It recommended that expenses and revenue be examined and a plan developed to eliminate future deficits. It conceded that the Local had sufficient net assets to absorb the operating deficits, but suggested that it should revise its 2022 budget to reflect the substantial increase in operating costs. **Ex. C** at p. 7.

47.    These deficits were temporary and were expected to be balanced by the end of the year. When the Local's Secretary-Treasurer was made aware of the supposed operating deficit alleged in the 2022 audit, he immediately contacted the Local's Business Manager and discussed a revision of the budget. He then called for a meeting with Plaintiffs to remedy the situation, as had been done in the past when necessary. The Local also had reserved funds built into the Local's budget for the specific, anticipated purpose of substantially reducing a deficit in the budget when necessary. **Ex. I** at ¶ 7.

48.     The deficits resulted from multiple conferences for trainings and conventions requiring payments of conference fees, lodging, and airfare. The deficits followed substantial staff turnover from death, retirement, and hiring of multiple executives. The deficits also occurred during the COVID-19 pandemic and shutdown, which greatly increased costs. The budget was expected to ultimately balance out by the end of the year, as it always had. **Ex. E** at ¶ 14; **Ex. F** at ¶ 5. This budgeting method is common and practiced by others, like DC 37. **Ex. E** at ¶ 15; **Ex. F** at ¶ 6. Resources at the Local had been managed in the same manner by an independent third-party Business Manager Company, Dean Archer and Associates, by Business Manager Glenn Dean, and Independent Auditors KBL LLP for over twenty (20) years; during this period, the Local had been audited annually by another independent Auditor and by AFSCME every two (2) years; yet no improprieties were ever found in these past audits **Ex. E** at ¶ 16; **Ex. F** at ¶ 7.

49.     Additionally, in response to the Audit Report Draft, the Policy Changes Draft would have clarified that a Deficit Reduction Plan would be a subset of the annual budget where the current deficit is reduced by very specific actions that would be undertaken in the fiscal year to realize savings on a reoccurring basis until the deficit is eliminated or significantly reduced. **Ex. G** at p. 7; **Ex. E** at ¶ 37; **Ex. F** at ¶ 31. The Local would have an operating budget for the next fiscal year that would be completed and adopted by July 1st annually. **Ex. E** at ¶ 38; **Ex. F** at ¶ 32.

                          CPA Annual Audits

50.     The Audit Report Draft raised concerns that the CPA annual audits were being turned in late, with the 2021 audit not yet being complete as of May 2022. It recommended that the Local complete its annual audit within six months of the year end to provide the executive board with timely information to make financial decisions. **Ex. C** at p. 7.

13

51.    The Policy Changes Draft responded to this concern by stating that the Local will have an operating budget for the next fiscal year that will be completed and adopted by July 1st annually. **Ex. G** at p. 8.

52.    Additionally, Plaintiffs did not have oversight responsibilities for these audits. The audits were instead outsourced to a third-party. **Ex. D** at 193:14-18.

<u>Payments to Consultants and Attorneys</u>

53.    The Audit Report Draft also questioned the Local's payments made to consultants and attorneys, speculating that consultants' and attorneys' monthly invoices seemed to be copies of the same work performed on several monthly invoices. It recommended that all consultant vendors should have a signed agreement on file, outlining the types of services performed and the length of time the agreement covers and the compensation to be paid. Such an agreement would be presented to the Executive Board for approval and noted in the meeting minutes. It recommended that the attorney on retainer should provide monthly detailed invoices of the work performed to justify the billing of the retainer fee. Any services resulting in additional costs billed to the Local would be detailed and properly explained as to why they are not covered under the retainer agreement. **Ex. C** at 7-8.

54.    The Policy Changes draft clarified, with regard to consultants, that a Local staff member would confer with the consultants monthly to discuss the work plan for the succeeding month. The Local would initiate the scope of the invoices to ensure the consultant's invoices reflect the work plan progress when submitting invoices. Ex. G at p. 8; Ex. E at ¶ 39; Ex. F at ¶ 33. Regarding the attorneys' invoices, the Local decided to create a new form to be implemented so that when an attorney submits a bill for a monthly retainer, that attorney must indicate the services they performed. Additionally, if an attorney bills for "extra retainer services," the work should be

detailed by date, time spent on the service, a description of the service, the attorney in the law firm who provided the service, and the hourly rate charged. It proposed a new form – entitled "Extra Retainer Services" – to capture this information. Additionally, invoices for additional retainer services from the Local's counsel were to be reviewed by Plaintiff Rodriguez, the Local's Business Manager, and the Local's Secretary Treasurer. **Ex. E** at ¶ 30; **Ex. F** at ¶ 34; **Ex. G** at p. 9.

Lost Time Payments Not Reported as Wages

55.    The Audit Report Draft stated that the Local paid members and officers for lost time for the election committee and other activities, but these payments were not reported as taxable compensation. It stated that payments for lost time constitute taxable income to the recipient and must be reported as wages subject to withholding, payroll taxes and preparation of IRS Form W2. Failure to properly report payments of wages can lead to Internal Service imposing penalties on the Local. **Ex. C** at p. 8.

56.    The Policy Changes Draft addressed this concern by stating a record of all lost time compensation would be kept by the Local staff and the CPA. A monthly record would be maintained, and each month a report would be made to verify and reconcile the information and to report names, amounts paid, for what purpose, and when. A copy of this monthly report would go to all the Officers of the Local. A copy of this monthly record would be filed with the Business Manager and CPA. It would be incorporated in the monthly Financial Statement of which it occurred and be a part of the Local's annual budget. **Ex. G** at p. 9; **Ex. E** at ¶ 41; **Ex. F** at ¶ 35.

Bank Accounts and Reconciliations

57.    The Audit Report Draft raised concerns regarding bank accounts and reconciliations. It noted a negative balance of $30,638.18 on December 31, 2020 and a negative balance of $25,032.52 on December 21, 2021. It stated that the operating account is administered

15

under a daily money market sweep to maximize interest income, and should have a daily balance of zero, but that there are numerous outstanding stale checks from 2019-2021 on the bank reconcilement that should be voided to correct the register balance. The auditors noted at least $21,485.15 in stale checks that should be voided or reissued if necessary. They also found an old investment account with a balance of $2.66 since December 2020, which should be closed. It recommended that stale checks be voided and removed from the outstanding checks, that the bank account balances be adjusted to ensure accuracy, and that the Local close any inactive accounts. **Ex. C** at p. 8-9.

58.     However, the Local's Business Manager was responsible for overseeing all bank accounts and any and all reconciliations. Secretary-Treasurer Cooper was never made aware of any outstanding or delinquent accounts causing harm to the budget. **Ex. I** at ¶ 9. Further, The Policy Changes Draft stated that the Executive Vice President as Chair and all the Officers of the Local would implement a plan immediately to reconcile this matter in a time certain not to exceed thirty (30) days. The Local would close any bank or investment accounts that were inactive and transfer those funds into current active accounts. **Ex. E** at ¶ 42; **Ex. F** at ¶ 36; **Ex. G** at p. 10.

Filing System for Paid Bills

59.     The Audit Report Draft addressed purported issues with the Local's filing system for paid bills. Specifically, it claimed that the system was inefficient for maintaining supporting documentation for paid bills. It explained that the paid bills are filed by month and a copy of the check, and the supporting documentation is maintained for each vendor payment. It believed that the check copies and supporting documentation were bundled together with rubber bands by month, but not maintained in numerical sequence. It recommended improved organization. **Ex. C** at p. 9.

16

60. The Local's filing system was in the process of being computerized during the 2022 audit. While in this transition stage, the auditors observed stacks of unpaid bills which were still being put into the system. **Ex. E** at ¶ 23; **Ex. F** at ¶ 14.

61. Regardless, the Policy Changes Draft stated a new filing system would be adopted implementing the vendor or payee by month and or year. A miscellaneous file would be established for other payees. **Ex. G** at p. 10; **Ex. E** at ¶ 43; **Ex. F** at ¶ 37.

<u>Meeting Minutes</u>

62. The Audit Report Draft stated that the review of the minutes provided indicated that monthly financial reports, annual budgets, and CPA audit reports were presented at executive board and delegate meetings, but that copies of the reports were not attached to the meeting minutes and financial reports were not presented at general membership meetings. It recommended copies of the Secretary-Treasurer's monthly financial report, annual budgets, and audit reports be attached to the meeting at which the report is given. It also recommended monthly financial reports and CPA audit reports should be presented and approved at regular Executive Board and general membership meetings. **Ex. C** at p. 9.

63. Plaintiff Roper always attached financial reports to the Executive Board meeting minutes in her records, which were maintained by the Local's Delegates and Board. **Ex. D** at 155:17- 157:4; **Ex. E** at ¶ 30; **Ex. F** at ¶ 12.

64. The Policy Changes Draft also proposed that attachments of the financial reports, annual budgets, and CPA Audit reports would be presented at general membership and Executive Board meeting and attached to the minutes. **Ex. G** at p. 11; **Ex. E** at ¶ 44; **Ex. F** at ¶ 38.

<u>Policies and Procedures Manual</u>

65.    The Audit Report Draft noted that the Local's Policies and Procedures Manual was not dated, and the auditors claimed that they were unable to determine whether it was approved by the Board. It recommended that the Local update its Policies and Procedures Manual to include compensation, hiring, credit cards, expenditures and expense reimbursements, and have it approved by the Executive Board and reviewed and updated periodically. **Ex. C** at p. 10.

66.    The Policy Changes Draft addressed this final concern by stating a new Manual of Policies and Procedures would be created and approved by the Executive Board. The manual would be reviewed and updated periodically by the Local's Executive Board. **Ex. G** at p. 11; **Ex. E** at ¶ 45; **Ex. F** at ¶ 39.

**<u>Administratorship and Hearing</u>**

67.    Although the already-existing practices of the Local adhered in every way to practices accepted throughout the national union, Ms. Roper decided that key personnel should meet to discuss the areas identified in the Audit Report Draft and the changes proposed in the Policy Changes Draft. **Ex. E** at ¶ 28.

68.    Personnel members whose attendance was anticipated at this meeting included Plaintiff Roper, Ms. Williams, Plaintiff Rodriguez, attorney Joe Farelli, Business Manager Glenn Dean, Consultants Dan Persons and Renee Gainer, Secretary-Treasurer Felix Cooper, 2nd Vice President Jim Hamlin-McLeod, 3rd Vice President Jamaisa Johnson, Recording Secretary Rhonda Myers, and the Local's Office Staff.

69.    The meeting was scheduled to take place on September 19, 2022, just over two (2) weeks from the Audit Report Draft and before the thirty (30)-day deadline.

70.    However, this meeting never occurred. Before the meeting could occur, the AFSCME imposed an Administratorship upon the Local and immediately suspended Plaintiffs. *Id.*; **Ex. A**; **Ex. B**; **Ex. D** at 105:6-107:6.

71.    Plaintiffs were, therefore, unable to respond to the auditors.

72.    On September 19, 2022, Plaintiff Rodriguez and Plaintiff Roper were sent notice that in the opinion of Mr. Saunders, an "emergency situation" existed in Local 1549, and he was placing the Local under Administratorship, "pending notice and hearing."

73.    In that same letter, Mr. Saunders informed Plaintiffs that they were immediately suspended from office. **Ex. B.** That same day, Mr. Saunders sent an email terminating their employment, with no hearing on the matter and with no further investigation to determine whether an Administratorship was necessary or whether impropriety occurred at the Local.

74.    Mr. Howell, appointed Administrator of AFSCME Local 1549, sent a memo to all Local 1549 employees notifying them of his decision to rescind all officer and staff severance and compensatory time payment policies and practices, effective immediately and indefinitely. *See* September 19, 2022 Memo from Administrator James Howell to AFSCME Local 1549 Employees, annexed hereto as **Exhibit J**.

75.    On September 20, 2022, Carla Insinga, the Judicial Panel Chairperson, informed Plaintiffs that she would serve as the Administratorship Hearing Board and that a hearing was scheduled to take place on October 2, 2022 in order to ensure that "all interested parties [are] given a fair opportunity to present their views on this matter." *See* Notice of Hearing Letter dated September 20, 2022, annexed hereto as **Exhibit K**.

76.    Participants were instructed to notify the Judicial Panel by 5:00 p.m. on September 27, 2022 of their intent to participate. **Ex. K.**

77.     Plaintiffs deemed it necessary to obtain legal counsel to assist them with their hearing on their administrative appeal to the Judicial Panel, challenging the Administratorship and termination decisions.

78.     However, as only a seven (7)-day period was scheduled between the notice of the hearing and the deadline to notify the Judicial Panel of their participation, they had extremely limited time to find, retain, and properly prepare attorneys in this matter; still, a good faith effort was made by Plaintiffs to do so.

79.     On October 3, 2022, Plaintiffs' newly retained counsel emailed Andrew Matus, the Assistant to the Judicial Panel Chairperson on AFSCME's Judicial Panel, requesting a two (2)-week adjournment of the hearing to review and familiarize himself with the matter prior to the proceeding. *See* email from Edward Tobin, Esq. to Andrew Matus dated October 3, 2022, annexed hereto as **Exhibit L**.

80.     That afternoon, Chairperson Insinga denied the request in an email, attached hereto as **Exhibit M**, explaining that Article IX, Section 40 of the AFSCME International Constitution states:

> A hearing shall be held before the Administratorship Hearing Board as soon as is consistent with due process, but not less than seven days' notice, and not later than twenty-one days after the imposition of an Administratorship pursuant to Section 37 herein. All interested parties shall be given a fair opportunity to present their view on the matter.

Ex. M.

81.     As the Administratorship was imposed on September 19, 2022 and hearing notice given September 20, 2022, Chairperson Insinga explained that the hearing must be held on or before October 11, 2022. Ex. M.

82.    Chairperson Insinga did not offer to postpone the hearing until October 11, 2022, which would have been both within the guidelines and more consistent with due process.

83.    On October 4, 2022, the hearing was held. Chairperson Insinga sat on the Judicial Panel.

84.    During the hearing, testimony was heard from Mr. Howell, Mr. Delpino, Plaintiff Roper, Plaintiff Rodriguez, and Felix Cooper, the Secretary Treasurer for the Local.

85.    During his testimony, Mr. Delpino indicated that he had not comprehensively documented alleged evidence of lost wages not being reported as taxable income because the amounts were too small to include. **Ex. D** at 81:2-6.

86.    Mr. Delpino testified that he was not able to uncover evidence of any improper distribution of any gift cards, but instead found insufficient documentation to determine impropriety. **Ex. D** at 81:11-82:11.

87.    Mr. Delpino confirmed that the years that reflected high car service expenses were during the height of the COVID pandemic and its resulting shutdown, which severely limited public transportation Plaintiff Rodriguez required to attend to his duties. **Ex. D** at 82:12-83:4.

88.    Mr. Delpino also admitted that he did not reach out to Plaintiffs to discuss any findings, nor to get a more comprehensive explanation for his finding. **Ex. D** at 87:11-19; **Ex. E** at ¶ 29; **Ex. F** at ¶ 20.

89.    Mr. Delpino found no evidence that the gift cards were improperly distributed. **Ex. D** at 81:7-82:11.

90.    Mr. Cooper testified that he signed off on credit card usage, as was recommended by the AFSCME Financial Standards Code when officers choose to use a credit card. **Ex. D** at 190:6-191:6.

91. Additionally, while counsel for President Saunders was permitted to fully examine Mr. Delpino, counsel for Plaintiffs was not permitted to do the same.

92. For example, during his examination of Mr. Delpino, Marshall Bellovin, Esq., counsel for Plaintiffs, attempted to question Mr. Delpino about his knowledge of DC 37, its practices, and its history with audits, but was prevented from doing so by Chairperson Insinga. **Ex. D** at 90:16-94:17; 96:13-100:14.

93. This information would have led to the discovery of disparate treatment of the Local, which had modeled its own policies after DC 37, though DC 37 was not subjected to the same sort of poorly handled auditing procedures, and officers of other union locals were not placed under Administratorship, suspended, nor terminated. **Ex. E** at ¶¶ 15, 18, 20; **Ex. F** at ¶¶ 6, 9, 11; Ex. H at ¶ 79.

94. It also may have revealed political animosity existing between the two locals providing a motivation for DC 37 to orchestrate an Administratorship of the Local and termination Plaintiffs from their positions. **Ex. H** at ¶¶ 7, 8, 80.

95. For example, the testimony may have revealed that DC 37 planned to put the Local on Administratorship the year before it happened. **Ex. H** at ¶ 20.

96. It may have revealed mistreatment on the part of DC 37 against the Local related to sending vital information during the pandemic. **Ex. H** at ¶ 25.

97. It may have revealed that DC Clerical-Division staff Director Kenneth Mulligan interfered in the Local's internal politics and attempted to talk to the then-leaders of the Local's 911 Chapter into running against or opposing Plaintiffs in the 2018 election. **Ex. H** at ¶ 28.

98. It may have revealed that DC 37 hired former Local staff after Plaintiff Rodriguez had relieved them of their duties as grievance representatives of the Local. **Ex. H** at ¶ 34.

99.    It may have revealed that some of DC 37's Clerical Division staff sabotaged the Local's leadership by intentionally failing to represent Local members properly, so as to manufacture opposition to Local leaders running for re-election in 2021 following the 2018 Local election. **Ex. H** at ¶ 40.

100.    It may have revealed that DC Executive Director Garrido denied DC 37 Political Action staff and resources for the AFSCME PEOPLE Program in 2018. **Ex. H** at ¶ 54.

101.    It may have revealed that in 2019, DC37 and Mr. Garrido hired several former Local 1549 members that had been removed from office for supporting the Local Board's political opponents. Affidavit of Jamaisa Johnson dated August 10, 2023, annexed hereto as **Exhibit N** at ¶ 4.

102.    It may revealed that since this time, Mr. Garrido has specifically targeted the Local's 1549 Grievance Representative by having the DC37 Director assign uneven work assignments and constantly changing work assignments, as well as denied access to premises for conference and training which other locals were given access to. Ex. N at ¶ 5.

103.    It may have revealed the abusive behavior and vindictiveness on the part of officials at DC 37. Ex. H at ¶ 59, 78, 80.

104.    The information would have supported Plaintiffs' claims that all their policies and practices were custom, standard practices of locals. It would have illuminated political circumstances surrounding the Local's leadership and attacks led by those who ran against Plaintiffs in past union elections.

105.    On October 22, 2022 the AFSCME Judicial Panel issued their decision upholding the Administratorship.

106.    The AFSCME Judicial Panel, after denying Plaintiffs the opportunity to provide a proper response, conducting the hearing in an improper manner, and after "considering" all the evidence Plaintiffs presented above, upheld Mr. Saunder's decision to place the Administratorship on the Local and terminate Plaintiffs.

107.    In light of the inadequate investigation, the denial of a proper response, and the improper manner in which the hearing was conducted, Plaintiffs sought a reversal of the Judicial Panel's decision.

108.    On November 13, 2023, Plaintiffs appealed the Judicial Panel decision.

109.    Plaintiff's appeal of the Judicial Panel Decision was assigned to be heard by Chairperson Insinga, who sat on the Judicial Panel that heard Plaintiff's original appeal.

110.    The hearing was held on November 20, 2023, via Zoom.

111.    On January 11, 2024, Chairperson Insinga, despite Plaintiffs presenting the above evidence, upheld the Judicial Panel Decision. Chairperson Insinga's Decision is annexed hereto as **Exhibit P**.

112.    On February 8, 2024, Plaintiffs filed a Notice of Appeal to the full Judicial Panel.

113.    Plaintiffs' Appeal was heard by the full Judicial Panel on May 7, 2024 via Zoom, and the appeal was denied.

114.    On June 7, 2024, Plaintiffs appealed to the AFCSME International Convention.

115.    Plaintiffs' appeal to the AFSCME International Convention was heard on August 14, 2024, in Los Angeles, California.

116.    On August 19, 2024, the AFSCME International Convention issued a decision denying Plaintiffs' appeal of the full Judicial Panel's decision and upholding the original AFSCME

judicial panel decision. The AFSCME International Convention's decision is annexed hereto as **Exhibit Q**.

117.    The AFSCME International Convention decision is a final decision.

118.    Plaintiffs had thereby exhausted all internal remedies.

## AFSCME's Failure to Follow its Own Procedures Violates Due Process.

119.    Article X, Section 12 of Defendant AFSCME's Constitution provides an accused party with several rights, including "[t]he right to confront the accuser" (Subsection E), "[t]he (right to cross-examine the accuser and any witnesses" (Subsection F), "[t]he right to present witnesses in the accused person's behalf" (Subsection G), and "[t]he right to compel the production of union records pertinent to the case" (Subsection H). As set forth herein, Plaintiffs were denied all these rights in the union disciplinary hearing. *See* AFSCME International Constitution, annexed hereto as **Exhibit O**, p. 133.

120.    Article X Section 14 (B) of Defendant AFSCME's Constitution requires any Charging Party such as Mssrs. Carter and Lackhan to be present at Plaintiffs' trial.

121.    Charging Party Carter appeared at the trial initially in the audience, but did not testify and left before Plaintiffs could question him after testimony had been received.

122.    When Plaintiffs and Mr. Palladino called Charging Party Mr. Lackhan to testify. The Hearing Officer advised Mr. Lackhan that he had no obligation to testify. Plaintiffs objected, but the Hearing Officer repeated her instruction to Mr. Lackhan that he need not testify or be subject to cross-examination. Mr. Lackhan refused to testify, and was then excused from testifying although he remained present at the hearing.

123.    Neither Mr. Del Pino nor Mr. Apata, who prepared the Draft Audit, appeared at the hearing.  Mr. Ralph Palladino objected to the admission of the Draft Audit without their appearing, but the Draft Audit was admitted, and relied on heavily in Ms. Insinga's decision.

124.    The Draft Audit was labelled as a "draft." Plaintiffs were deprived of the opportunity of questioning the Field Auditors as to whether a Final Audit had been prepared and, if so, to review and put that Final Audit into evidence; and, if not, to understand what information would be needed to prepare the a Final Audit. As such, Plaintiffs were deprived of the factual basis on which to argue that the Hearing Office should not accord the full weight that she did in fact accord to the Draft Audit.

125.    Auditor William Delpino wrote in his initial report that before a final report is completed, a draft is issued to local officers. Before the auditing process is completed by the issuance of a final report, it is the custom, standard, and practice to give local officers thirty (30) days to review the draft and provide comments. **Ex. D** at 37:14-21.

126.    However, Plaintiffs were deprived of their time to reply.

127.    The sole Charging Party to testify at both the initial judicial panel hearing and the Full Judicial Panel hearing, Honda Wang, admitted "I have no personal knowledge of any wrongdoing" by Plaintiff. Charging Party Wang, who had been a member of the local for only two years at the time of the November 20, 2023 hearing, stated that he was relying solely on the Draft Audit as to the charges against Plaintiffs. By not having any personal knowledge of the facts that would support the charges against Plaintiffs, the prejudice to Plaintiffs by the failure to produce either of the Field Auditors was worsened.

128.    Article XII, Section 13 of the AFSCME Constitution declares, "[t]he language of this Constitution, including the Bill of Rights for Union Members, shall be liberally construed, and shall be interpreted in a manner designed to fully protect the fundamental rights of members."

129.    Article IX, Section 31 of the AFSCME Constitution provides that when audits are conducted they

> shall be conducted in accordance with the AFSCME Financial Standards Code and generally accepted accounting, administrative and management principles . . . Upon completion of the review or audit, the International Union shall issue a report to the subordinate body containing the findings of the review or audit. Such report shall advise the subordinate body of any deficiencies or improprieties found, any actions required to remedy such deficiencies or improprieties and any recommended actions to improve the financial practices of the subordinate body.

**Ex. O** at pp. 99-100.

## FIRST CAUSE OF ACTION
### (Violation of LMRDA Section 101( c)(5))

130.    Plaintiffs re-allege and incorporate all prior paragraphs herein by reference.

131.    At all relevant times, Plaintiffs were active members of Local 1549.

132.    More than four months have elapsed since the rendering of the final decision by Defendant.

133.    The requirements of Defendant AFSCME's Constitution are incorporated into and give concreteness to Plaintiffs' statutory right to a "full and fair trial."

134.    The denial of Plaintiffs' rights under AFSCME's constitution, the bias of the Hearing Officer and the violations of fundamental due process set forth above prevented Plaintiffs from receiving a full and fair trial as required by LMRDA Section 101(c)(5), 29 U.S.C. § 411(c)(5).

135.    As a result of Defendant's conduct, Plaintiffs have incurred, and will continue to incur damages thereby, including but not limited to lost income and attorneys' fees.

136.    As a result of Defendant's conduct, Plaintiffs have suffered and continue to suffer emotional distress.

### SECOND CAUSE OF ACTION
### (Violation of LMRDA Section 301)

137.    Plaintiffs re-allege and incorporate all prior paragraphs herein by reference.

138.    Defendant AFSCME's Constitution is a contract that Plaintiffs may enforce pursuant to LMRA Section 301, 29 U.S.C. §185.

139.    Defendant's actions as set forth herein substantially and materially violated Defendant AFSCME's Constitution resulting in prejudicial and improper discipline against Plaintiffs.

140.    As a result of Defendant's conduct, Plaintiffs have incurred, and will continue to incur damages thereby, including but not limited to lost income and attorneys' fees.

141.    As a result of Defendant's conduct, Plaintiffs have suffered and continue to suffer emotional distress.

**WHEREFORE**, Plaintiffs pray that judgment be entered against Defendant, jointly and severally, awarding Plaintiffs compensation and other damages:

i.    On the First and Second Causes of Action, judgment for compensatory and punitive damages and attorneys' fees, in an amount to be determined at trial; and

ii.    Declaring that Plaintiffs did not receive the statutorily mandated full and fair trial;

iii.    Voiding the requirement that Plaintiff Eddie Rodriguez reimburse AFSCME in the amount of $31,339.93 for properly incurred car services during the COVID pandemic while performing his duties as President of AFSCME Local 1549;

iv.    Restoring membership of Local 1549 and all accompanying rights and benefits to Plaintiffs;

v.    That Plaintiffs have such other, further, and different relief as the Court deem just, proper, and equitable in the circumstances, together with interest on all Causes of Action, attorneys' fees, and costs and disbursements in this action.

Dated: New York, New York
        February 18, 2025

                                    BALLON STOLL P.C.

                                    By:_____*s/Marshall Bellovin*_____
                                          Marshall B. Bellovin, Esq, MB5508
                                          *Attorneys for Plaintiff*
                                          810 Seventh Avenue, Ste. 405
                                          New York, New York, 10019
                                          212-575-7900